UNITED STATES of America, Plaintiff,

v.

**$28,980 IN UNITED STATES CURRENCY, in rem, Defendant.**

Civ. No. 90–21–BE.

United States District Court, D. Oregon.

Nov. 13, 1990.

---

Charles H. Turner, U.S. Atty., D. Or., Leslie J. Westphal, Asst. U.S. Atty., Portland, Or., for plaintiff.

Edward L. Strand, Tigard, Or., for claimant Peinado.

OPINION

BELLONI, District Judge.

This is an action for the civil forfeiture of $28,980 in United States currency. Claimant Santos Raucho Peinado moves to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment (# 33–1). Peinado also moves for summary judgment (# 33–2). Finally, the United States moves for summary judgment (# 28).

I. MOTION TO SUPPRESS

 Although forfeiture actions are generally civil in form, they are "quasi-criminal" in nature. Therefore, the exclusionary rule prohibits the government from using evidence obtained in violation of the Fourth Amendment to prove a forfeiture. *United States v. One 1977 Mercedes Benz 450SL*, 708 F.2d 444 (9th Cir.1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984). A prior determination regarding admissibility in a related criminal proceeding is binding in a forfeiture action. However, in a case such as this one, where no criminal charges were pursued, the court may take evidence and determine the motion to suppress.

1. *Findings of Fact*

The parties presented their evidence regarding the motion to suppress in the form of affidavits, depositions and other documentary evidence. Based on the evidence presented, the court makes the following findings of fact.

On the evening of May 22, 1989, Trooper Walt Markee of the Oregon State Police was patrolling Interstate 5 in the area of Grants Pass, Oregon. Trooper Joel McNerney was riding with Markee. At approximately 8:50 p.m. Markee pulled over a 1976 Ford Elite with California license plates which was travelling south on Interstate 5. Markee had observed the Elite commit a traffic violation, changing lanes without signaling.

Markee approached the driver's side of the car and McNerney went to the passenger side of the car. Markee told the driver, Carlos Rivera, that he had been stopped for changing lanes without signaling. Markee asked Rivera for his driver's license and for the registration to the car. Rivera produced a valid California driver's license and stated that the car belonged to the passenger, Peinado. Markee then asked Peinado for identification and the car registration. Peinado produced a valid California driver's license and a vehicle registration. The registration showed the same address as Peinado's license, but a different name. Peinado explained that his wife owned the car.

By this time Markee had observed several characteristics which, in his experience, suggested that Rivera and Peinado might be narcotic traffickers: two male subjects, wearing gold jewelry, fast food containers in the car, a heavy odor of air fresheners in the car, no visible luggage, and the fact that the car was a large, older car which was not registered to either of the occupants. He decided that he would like to search the car.

Markee told Rivera that he was being issued a warning for the traffic violation and would not be receiving a citation. Markee turned off the flashing lights of his patrol car and told Rivera and Peinado that they were free to leave. Markee asked them if they understood that they were free to leave, and both replied that they did. Markee waved and said goodbye, and Rivera waved back. Both Rivera and Peinado seemed nervous and anxious to leave.

As Rivera put the vehicle into gear, Markee asked them if they were transporting any cocaine, marijuana, heroin or large sums of cash. Both avoided eye contact with Markee, laughed and said "no." Markee then asked for permission to search the car. Rivera and Peinado looked at each other and Rivera said "sure" as Peinado shrugged his shoulders and said "OK."

Rivera got out of the car and opened the trunk with the car keys. Markee asked Peinado to exit the vehicle and asked both to stand on the passenger side of the patrol car with McNerney, where they would be safe from traffic. Markee began to search the car and noticed that the bottom of the back seat was not fastened down. He pulled on the back seat and found two packages which had been concealed behind the back seat. These packages were almost square in shape, wrapped in brown paper and further wrapped with masking tape. Markee poked a hole in the packages and saw cash inside.

Markee exited the car and asked Peinado and Rivera whose money was in the package. Both said that the cash was theirs. Markee stated that he suspected that the cash was derived from the sale of narcotics. Peinado and Rivera continued to claim that the money was theirs, and Peinado said that the cash was meant to buy a house in Portland, that they had driven from Pomona, California, to Portland, Oregon and that they were now returning to Pomona. Both agreed to empty their pockets, and Rivera's pockets contained a receipt from a Portland motel for May 21 and 22, 1989.

Markee asked Rivera and Peinado to return with him to the Oregon State Police office in Grants Pass, Oregon, and they consented. Peinado agreed to travel in the back seat of the patrol vehicle while Rivera followed in the car. Markee asked them to travel in this fashion so that they could not use the travel time of approximately 20 minutes to agree on a story regarding the cash.

At the police office, Peinado and Rivera were interviewed separately. No *Miranda* warnings were given. Rivera stated that he had seen a house in Portland, Oregon advertised for $30,000 in the Pomona Penny Saver; that Rivera and Peinado decided to drive to Portland and purchase the property; that they reached Portland at 10:00 a.m. on May 21, and checked into the Coliseum Motel; that they only stayed two hours at the motel because they called their uncle; that the uncle picked them up from the motel and they spent the night at the uncle's house; and that Rivera called the phone number in the Penny Saver ad, but they did not purchase the house because the actual price was $100,000. Rivera claimed that he did not know his uncle's name or address because this was the first time he had met him. Rivera stated that half the money belonged to Peinado.

Peinado stated that all of the money was his, and that he had earned it from the sale of a house. Peinado indicated that he knew nothing about the Penny Saver ad. Peinado stated that after he and Rivera arrived in Portland and rented a room at the Coliseum Motel, they called some realtors, but none would answer the phone; that they spent the night in the motel and the next day phoned their uncle, whose name is Monico Estrada; and that they visited Estrada for about two hours and then left Portland.

After the interviews Markee asked Peinado and Rivera if he could hold the cash while the investigation continued. Both agreed, provided that they were given a receipt. The money was then counted on a table that had been cleaned since drugs were last present. The officers wore latex gloves while counting the money. Each package contained fifteen bundles of approximately $1,000, separated with rubber

bands. The two packages contained a total of $28,980, plus one counterfeit $20 bill.

Peinado and Rivera left the police office at approximately 10:30 to 11:00 p.m., at least 90 minutes after they were first stopped. Markee and McNerney took the money to Canyonville, Oregon, where the money was tested by a trained narcotics dog under the supervision of a canine handler. The dog alerted to the presence of narcotics on the money.

### 2. Was There a Second Investigative Stop?

■ Peinado contends that although the initial stop may have been a valid traffic stop, Markee's question regarding drugs and money and his request for consent to search was a second stop which was not supported by reasonable suspicion. Under *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), in order to make an investigative stop, an officer must have reasonable suspicion of criminal activity which is supported by articulable facts. However, it is unnecessary to determine whether Markee had reasonable suspicion at this point, because Markee's questions did not constitute a second stop.

■ It is well established that not every police encounter is a seizure as defined by the Fourth Amendment. *United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1504 (9th Cir.1988). An encounter becomes an investigatory stop only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The fact that an officer asks a question and that a person chooses to cooperate does not, in itself, imply that the person has been subjected to a stop. *Id.* at 555–556, 100 S.Ct. at 1878.

Peinado argues that he and Rivera reasonably believed that they were not free to leave because Markee questioned them while they were still within the "psychologically coercive penumbra" of the traffic stop. Peinado further argues that the question regarding drugs and money was so forward and rude and implied such a serious accusation that they were compelled to stay and answer Markee.

■ However, the law does not support these assertions. The questioning of a driver on an open highway by a policeman is not in itself a police dominated situation which constitutes a stop. *Lowe v. United States*, 407 F.2d 1391, 1394 (9th Cir.1969). The Hon. Robert E. Jones recently found, under very similar facts, that once a driver is told that he is free to leave following a traffic stop, his choice to stay and answer further questions does not transform the encounter into an involuntary stop. *United States v. Mendoza–Carrion*, Slip Op. at 2, 1990 WL 357917 (D. Or., September 5, 1990).

■ In this case, Markee did everything that an officer could do to inform Peinado and Rivera that the traffic stop was at an end. Markee turned off the flashing lights of the patrol car, told Peinado and Rivera that they were free to leave, asked them if they understood that they were free to leave, and waved and said goodbye. The court finds that the circumstances were not so coercive as to transform the encounter into a stop, and that Rivera and Peinado voluntarily answered Markee's questions and consented to the search of the car.

### 3. Did the Search Exceed the Scope of the Consent?

Peinado next contends that Markee exceeded the scope of any consent to search the car by opening the packages found behind the back seat so that he could see their contents. The scope of a consent is a question of fact to be determined on the basis of the totality of the circumstances. *United States v. Sierra–Hernandez*, 581 F.2d 760, 764 (9th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978). In *Sierra–Hernandez*, the court found that a driver's consent to "look inside the truck" covered a search not only in the cab of the truck, but also in the cargo area and under the hood of the truck, where marijuana was found. *Id.*

The Ninth Circuit has held that a general consent to search an area extends to con-

tainers similar to the packages in this case. In *United States v. Sealey*, 830 F.2d 1028 (9th Cir.1987), the defendant's wife gave officers permission to search the house for a gun and for drugs. The court held that the officers did not exceed the scope of the consent by opening a partially zipped travel bag, and by opening boxes, covered plastic buckets and sealed PVC pipes. 830 F.2d at 1031. In *United States v. Lopez–Diaz*, 630 F.2d 661, 667 (9th Cir.1980), the court held that consent to search a van reasonably extended to looking inside a pillow case which was found in the back of the van.

■ In this case, since Markee asked for permission to search immediately after asking if the car contained drugs or large amounts of money, the consent should reasonably be construed to cover containers within the car that could contain such items. The cases cited by Peinado are not germane, because they deal with searches of sealed containers where no consent was asked or given. *See Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981); *United States v. Miller*, 769 F.2d 554 (9th Cir.1985). The Ninth Circuit subsequently made it clear in *Sealey*, that the "sealed container" rule does not apply where such containers fall within the scope of a consent to search. 830 F.2d at 1031.

■ As discussed above, the consent to search the car was voluntary and contemplated a search for drugs and large amounts of money. Therefore, Markee did not exceed the scope of the consent by looking into the packages found behind the back seat.

### 4. *Did the Investigation Exceed Permissible Time Limits?*

■ Peinado contends that whether the situation is viewed as a consent search or an investigative stop, he and Rivera were not free to leave after the money was discovered and the investigation stretched on beyond any permissible time limits. There is no evidence that Markee intended to arrest Peinado and Rivera after discovering the money. Markee did not handcuff or frisk Peinado and Rivera, and did not read them the *Miranda* rights. Rather, the facts support Markee's statement that he intended to investigate the source of the money, and that Peinado and Rivera continued to cooperate with the investigation.

The discovery of the money hidden behind the back seat, in connection with the other factors observed initially by Markee, created reasonable suspicion to support an investigative seizure of the money and the questioning of Peinado and Rivera as to the source of the money. Although the brevity of the stop is an important factor in determining whether an investigative stop meets the requirements of the Fourth Amendment, the court must also consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). In *Sharpe*, the Supreme Court held that a 40 minute detention was not excessive where most of the delay was caused by practical considerations involved in securing and moving between two vehicles that had been stopped. *Id.* at 687, 105 S.Ct. at 1576.

In the recent case of *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Supreme Court approved an even longer delay. In *Sokolow* agents stopped the defendant in an airport at 6:30 p.m. and held his luggage for a sniff test by a trained dog and while awaiting the issuance of a search warrant. The Court held that it was not unreasonable to keep Sokolow's luggage overnight, because by the time the sniff test was performed at 9:30 p.m., it was impossible to get a search warrant before morning. 490 U.S. at 3, 109 S.Ct. at 1583.

Contrary to Peinado's contention, the decision in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), does not impose an outer limit of 90 minutes for an investigative seizure. In *Place*, the Court found that a delay of 90 minutes was unjustified because the police knew of the defendant's arrival time at an airport for several hours beforehand, and thus could have arranged for a trained narcotics

dog in advance. *Id.* at 709. In this case, there is no suggestion that the officers could have done anything to prepare in advance for the investigation, or to shorten the investigation.

■ The scope of the investigative stop in this case reasonably included counting the money and interviewing both Peinado and Rivera. It would have been inconvenient and possibly unsafe to do this on the shoulder of Interstate 5 at night. The rural nature of the area meant that the nearest police office was twenty minutes away, in Grants Pass. Thus, as a practical matter, it was reasonable to move the investigation to the police office, and an investigation of 90 minutes was not excessive under the Fourth Amendment.

Moreover, the facts indicate that Peinado and Rivera did not object to moving the investigation to the police office, and that they voluntarily consented to have Peinado travel in the patrol car. As discussed above, neither Peinado or Rivera was handcuffed, and Rivera drove unaccompanied to the police office. The fact that Peinado traveled in the patrol car does not require a finding that he was arrested or that his consent to ride in the patrol car was not voluntary. *See United States v. Carrillo,* 902 F.2d 1405 (9th Cir.1990).

5. *Should the Evidence of the Sniff Test be Excluded?*

Finally, Peinado contends that the sniff test by the police dog should be excluded because the currency has been converted into a cashier's check and is no longer available for Peinado to test. Peinado argues that the police dog alerted only to "some" of the currency, and that he should have been allowed an opportunity to show that any drug contamination on the currency was only incidental and consistent with having received the currency through legitimate channels.

■ The leading case regarding the failure to preserve evidence is *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), in which the Supreme Court held that the due process clause does not require law enforcement

officers to preserve breath samples in order to introduce breath analysis tests at trial. *Id.* at 488, 104 S.Ct. at 2533. The Court established a two-part test to determine whether a failure to preserve evidence constitutes a due process violation. First, the unpreserved evidence must "possess an exculpatory value that was apparent before the evidence was destroyed." *Id.* at 489, 104 S.Ct. at 2534. Second, the evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.*

The *Trombetta* decision noted that although the preservation of breath samples might conceivably have contributed to the defendants' defenses, the chances were extremely low, due to the usual accuracy of Intoxilyzer results. Further, the court stated that even if the results had been inaccurate, the defendants had alternate means of demonstrating their innocence, including presenting evidence that could impeach the reliability of the test results. *Id.* at 490, 104 S.Ct. at 2534.

The Ninth Circuit applied the *Trombetta* test in the context of dog sniff tests in *United States v. Dela Espriella,* 781 F.2d 1432 (9th Cir.1986). In that case, the defendant argued, as does Peinado, that the government's failure to preserve the currency deprived him of the opportunity to examine the money and test for traces of cocaine himself. The court found that the defendant did not satisfy the *Trombetta* test, as the currency would not necessarily have been exculpatory.

■ The court can find no useful distinction between this case and the facts in *Dela Espriella.* As in *Trombetta,* there is no evidence that the government deposited the currency into a bank in bad faith. Accordingly, Peinado's motion to suppress the dog sniff test will be denied. However, Peinado will not be prevented from presenting evidence which challenges the accuracy of the test, or which indicates that a positive test result may be consistent with a legitimate source for the currency.

## II. MOTIONS FOR SUMMARY JUDGMENT

 Peinado and the government make cross-motions for summary judgment. In light of the denial of Peinado's motion to suppress, his motion for summary judgment must also be denied. The government has presented evidence which could satisfy its burden to show probable cause for the forfeiture of the currency. This evidence includes the possession of such a large amount of cash, the fact that the money was hidden, the fashion in which the money was packaged, the denial by Peinado and Rivera that they were carrying a large amount of money, the inconsistencies in the explanations given by Peinado and Rivera, and the similarities between the trip to Portland by Peinado and Rivera and the modus operandi employed by drug couriers.

However, Peinado has also submitted sufficient evidence to create factual issues as to whether the currency was the proceeds of narcotic traffic, or used or intended to be used to facilitate narcotic trafficking. Peinado has submitted affidavits, his own and that of the purported buyer, Jose Veloz, which state that during the year or two prior to May, 1989, Peinado received approximately $28,000 under a lease/purchase agreement for a piece of property owned by Peinado. A jury reasonably could accept Peinado's evidence that the money came from a legitimate real estate transaction. The evidence of drug involvement presented by the government is not conclusive.

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, "the district judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 798 (9th Cir.1987). Thus, the court cannot assess the credibility of Peinado's evidence at this point, and the motions for summary judgment of both Peinado and the government must be denied.

## CONCLUSION

The motion of Peinado to suppress evidence is denied (# 33–1). The cross-motions of Peinado (# 33–2) and the United States (# 28) for summary judgment are denied.