UNITED STATES of America, Plaintiff,

v.

$64,765.00 IN UNITED STATES CURRENCY, Defendant.

Civ. No. 90–0009–BE.

United States District Court,
D. Oregon.

June 10, 1991.

Charles H. Turner, U.S. Atty., D. Oregon, Leslie J. Westphal, Asst. U.S. Atty., Portland, Or., for plaintiff.

Santiago E. Juarez, Juarez Law Office, P.S., Seattle, Wash., Charles G. Duncan, Eugene, Or., for claimant Esteban Vargas Elizalde.

## OPINION

BELLONI, District Judge.·

This is a civil forfeiture action. The plaintiff, the United States of America, has moved for summary judgment and the claimant, Esteban Vargas Elizalde, has made a cross-motion for summary judgment and to suppress evidence. The court held an evidentiary hearing with respect to the motion to suppress on March 18, 1991.

As a practical matter, the court must determine what evidence is admissible before addressing the motions for summary judgment. Therefore, the court will deal with the motion to suppress before turning to the motion for summary judgment.

## I. MOTION TO SUPPRESS

■ Although forfeiture actions are generally civil in form, they are "quasi-criminal" in nature. Therefore, the exclusionary rule prohibits the government from using evidence obtained in violation of the Fourth Amendment to prove a forfeiture. *United States v. One 1977 Mercedes Benz 450SEL,* 708 F.2d 444 (9th Cir.1983), *cert. denied,* 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984). A prior determination regarding admissibility in a related criminal proceeding is binding in a forfeiture action. In a case such as this one, where no criminal charges are pursued, the court may take evidence and determine a motion to suppress by the claimant.

### 1. *Findings of Fact*

At the evidentiary hearing, Oregon State Troopers Douglas Hoffman and Kevin Bennett testified on behalf of the government. Elizalde's testimony was presented to the court through two affidavits and a deposition. The court makes the following findings of fact with respect to the motion to suppress.

At approximately 1:20 a.m. on March 22, 1989, State Trooper Douglas Hoffman performed a routine survey of the South Umpqua Rest Area on Interstate 5, about 112 miles north of the California border. Hoffman noticed a 1985 Ford Thunderbird with a California license plate parked at the rest area. He observed that the Thunderbird had only one license plate, in violation of Oregon law.

Hoffman parked the patrol car to the rear and side of the Thunderbird, without blocking its ability to exit. The headlights, but not the flashing lights, of the patrol car were on. Hoffman checked with computerized Department of Motor Vehicle records, and was informed that the Thunderbird was registered to a car dealership in Chula Vista, California. Hoffman suspected that the Thunderbird might be stolen. At first,

Hoffman did not see anyone in the Thunderbird, but when he used his flashlight to check the vehicle identification number of the Thunderbird, Hoffman noticed the claimant lying in the rear seat and made contact.

Elizalde stated in his affidavits that he was not sleeping in the rear seat, but in fact was returning from the rest room at about 12:00 a.m. when Hoffman made contact. In his deposition, Elizalde conceded that he was resting in the Thunderbird when Hoffman arrived. Elizalde was also inconsistent regarding the timing of events. In his deposition he stated that he arrived at the rest stop around 10:00 or 11:00 p.m., and that he had been at the rest stop about 15 or 20 minutes. These discrepancies undermine Elizalde's credibility, and the court accepts Hoffman's testimony as to the time and manner in which he encountered Elizalde.

One of the Thunderbird's windows was slightly open, and Hoffman motioned to Elizalde to roll down the window. Elizalde opened the car door. Hoffman explained about the missing license plate and that the car was registered to a dealership. He asked Elizalde for his driver's license and registration. Elizalde gave him an Oregon driver's license, immigration papers and documentation on the car, which showed that it belonged to a Benito Garcia Rubio of Tucson, Arizona. Elizalde indicated that he had borrowed the car from Rubio.

After this discussion, Hoffman was satisfied that the Thunderbird was not stolen, but he suspected that Elizalde might be a drug or money courier. Hoffman gave Elizalde a warning regarding the license plate violation, returned Elizalde's documents and told him that he was free to leave. Hoffman asked Elizalde if he understood that he was free to go and Elizalde said "yes." Elizalde contends that Hoffman did not return the documents until the end of their encounter, but held the documents in his hand. In light of the many discrepancies in Elizalde's deposition and affidavits, and because it is physically unlikely that Hoffman conducted the search of the car while holding documents in his hand, the court accepts Hoffman's version of events.

Hoffman then asked Elizalde whether he was carrying any drugs and Elizalde said "no." Hoffman asked whether he could check the trunk of the car. Elizalde did not seem to understand at first, so Hoffman asked the same question in Spanish. In response, Elizalde, removed the keys from the ignition, walked to the back of the car, and opened the trunk. Hoffman asked again if he could check the trunk and its contents and Elizalde agreed.

Elizalde contends that he does not have a good command of English, and he did not fully understand the questions put to him or what was going on. He contends that Hoffman did not speak to him in Spanish. Hoffman testified that there was some language barrier, which required him to repeat some questions and to ask questions in Spanish before he felt that Elizalde understood.

However, it is clear from Elizalde's deposition that he understood when Hoffman asked whether he had any drugs; that he responded that he had no drugs; that Elizalde understood when Hoffman asked if he could search the trunk of the car; and that Elizalde responded that he could do it because he had nothing there. These admissions are generally consistent with Hoffman's version of events, and inconsistent with Elizalde's prior affidavits. The court accepts Hoffman's testimony that he asked certain questions in Spanish, and that Elizalde understood the gist of what was being asked.

The search of the trunk revealed no drugs or contraband. The trunk contained some plastic bags, a spare tire and jack, jumper cables, other car maintenance items such as a container of antifreeze, and a container of laundry softener.

Hoffman then asked if he could check the interior of the Thunderbird, and Elizalde nodded and gestured toward the car. Elizalde denied that Hoffman asked about searching the interior, but Hoffman's testimony is accepted due to Elizalde's lack of credibility. Elizalde was standing by the side of the Thunderbird while Hoffman

searched. Hoffman observed clothes hanging in the rear seat area and a pillow on the back seat. Hoffman tugged on the back seat and felt that it was loose. Hoffman picked up the pillow and felt that it was heavy. He suspected that it contained a handgun and felt the outside of the pillow. The pillow contained hard bulky items which were not consistent with a handgun.

Hoffman asked Elizalde whether the pillow contained narcotics or cash. At first, Elizalde denied knowing the contents of the pillow. After being asked several times, Elizalde indicated that the pillow contained money. Hoffman then radioed for assistance from Trooper Kevin Bennett, the operator of a trained police dog named "Mac." The radio call occurred about 11 minutes after Hoffman made contact with Elizalde.

Hoffman asked Elizalde who the money belonged to, and Elizalde told him that it belonged to Roberto Lopez of Los Angeles. Elizalde told Hoffman that he had a phone number for Lopez. Hoffman asked for the number, and Elizalde brought out his wallet. Hoffman examined the wallet and found a piece of paper with the name Lopez and a telephone number.

Bennett and Mac arrived at approximately 2:20 a.m. The officers did not ask Elizalde if they could use the dog to search the Thunderbird. The pillow was replaced in its original position. Mac alerted to the pillow and to the trunk of the car. Bennett put the pillow on the ground outside of the car to see if Mac would repeat his alert, and Mac did. On closer examination of the trunk, the officers found traces of suspected marijuana and cocaine residue in the trunk.

Elizalde contends that Hoffman did not ask him about the contents of the pillow until after Bennett arrived with Mac. In light of Elizalde's vague and conflicting testimony regarding the timing of events, the court accepts Hoffman's testimony as more credible and more likely. Elizalde also contends that he did not give Hoffman his wallet but that Hoffman took the wallet and looked through it while searching him.

Again, the court accepts Hoffman's version of events.

After Mac alerted to the pillow, Hoffman asked Elizalde how much money was in the pillow and Elizalde told him it was about $65,000 or more than $64,000. Hoffman dumped the contents of the pillow out on the hood of the Thunderbird. Hoffman found several bundles of money, with multiple thousands of dollars in each bundle. Hoffman asked Elizalde to accompany him to the patrol office where the money could be counted and a receipt provided. Elizalde indicated that he did not wish to go to the patrol office, and sat in the patrol car while Hoffman prepared a receipt for $65,-000. Elizalde was given the receipt, and left the rest area. The actual amount of the currency was later determined to be $64,765.

### 2. *Discussion*

Elizalde contends that the evidence regarding the currency and his statements should be suppressed because he was improperly detained on a pretext regarding the car's license plate. He argues that Hoffman did not have reasonable suspicion to justify his questions regarding drugs and the request to search the Thunderbird.

Elizalde next contends that any consent given by him was not voluntary, due to his inability to understand Hoffman and the coercive circumstances. Elizalde argues that he reasonably felt that he was not free to leave, and that he had to do what Hoffman asked. Elizalde also contends that the search exceeded the scope of any consent, which applied only to the trunk, and not to the rest of the car, or to the search by a dog. Finally, Elizalde contends that the extensive length of time that he was detained constituted an arrest without probable cause.

The government contends that the original contact between Hoffman and Elizalde was not a pretext, but was based upon reasonable suspicion. The government argues that Hoffman did not need reasonable suspicion in order to ask for consent to search the Thunderbird. The government contends that Elizalde was able to commu-

nicate and understand what was going on; he consented to the search of the trunk and the rest of the car; and the entire process consumed a reasonable time. Finally, the government contends that Elizalde was never placed under arrest, either officially or *de facto.*

■ The evidence does not support Elizalde's contention that Hoffman's decision to contact Elizalde was based on a pretext, and not upon reasonable suspicion. Hoffman decided to investigate the Thunderbird before he was aware that it had an occupant. The Thunderbird was an out-of-state vehicle without a front license plate, which is a violation under Oregon law. Hoffman also determined that the Thunderbird was registered to a California dealership before approaching the car. This created reasonable suspicion that the car might be stolen.

■ Once he contacted Elizalde, the initial investigative stop took only a few minutes. Hoffman satisfied himself that the Thunderbird was not stolen, warned Elizalde about the license plate violation, and returned his driver's license and documents. Hoffman then concluded the stop by telling Elizalde that he was free to leave and asking him if he understood. Thus, the initial stop did not exceed the brief investigatory detention contemplated by *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).

■ The question, then, is whether Hoffman's questions regarding drugs and his request for consent to search constituted a second stop which required reasonable suspicion. Not every police encounter is a seizure as defined by the Fourth Amendment. *United States v. $25,000 U.S. Currency,* 853 F.2d 1501, 1504 (9th Cir.1988). An encounter becomes an investigatory stop only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The fact that an officer asks a question and that a person chooses to cooperate does not, in itself, imply that the person has been subjected to a stop. *Id.* at 555–556, 100 S.Ct.

at 1877–78. A consent search is lawful if the consent is voluntary under the totality of the circumstances and not the product of duress or coercion. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973).

Elizalde argues that the facts surrounding the questions and request to search were so coercive that he reasonably felt that he was not free to leave or to refuse the search. The facts argued by Elizalde are not supported by the evidence. The patrol car was not blocking Elizalde's vehicle, the flashing lights were not activated, Elizalde's documents had been returned to him, and Hoffman told him that he was free to leave. Although there was some language difficulty, Elizalde has admitted that he understood when Hoffman asked him whether he had any drugs, and when Hoffman asked him if he could search the trunk of the car.

The Ninth Circuit has found that a defendant was free to leave under more inherently coercive circumstances, where the defendant was riding in a police vehicle, and where he was never told that he was free to leave. *United States v. Carrillo,* 902 F.2d 1405, 1411 (9th Cir.1990). This court has found, under very similar facts, that once a driver is told that he is free to leave following a traffic stop, his choice to stay and answer further questions does not transform the encounter into an involuntary stop if there are no other coercive circumstances. *United States v. $28,980 in U.S. Currency,* 786 F.Supp. 899, 903 (D.Or., 1990) (Belloni, J.).

There are no circumstances in this case that transform the encounter into an involuntary stop. Further, the facts do not support Elizalde's claim that his consent was not voluntary under the totality of the circumstances.

■ Elizalde next contends that the search exceeded the scope of any consent, which applied only to the trunk, and not to the rest of the car, or to the search by a dog. The court has found that Elizalde consented to the search of the trunk and

the interior of the car. Hoffman discovered the pillow containing the currency while within the reasonable scope of the consent to search the interior. Hoffman could feel that the pillow's contents were not consistent with a normal pillow. This gave rise to reasonable suspicion justifying Hoffman's questions to Elizalde regarding the contents of the pillow. Elizalde's answers gave Hoffman reason to believe that the pillow contained a large amount of currency.

This circumstance, in combination with several other factors, created reasonable suspicion that the currency was involved with drug trafficking and, consequently, forfeitable. Hoffman had observed several factors about Elizalde that were consistent with his experience of drug/money couriers operating on I–5. Elizalde was driving an American made, semi-luxury car; the Thunderbird was not registered to him; he was headed south on I–5 into California, a common courier route; and he had little luggage for a trip out of state. Elizalde had given inconsistent answers regarding the contents of the pillow, first indicating that he did not know the contents, then stating that the pillow contained currency. These factors justified detaining Elizalde in order to conduct a further investigatory stop while a narcotics canine searched the vehicle and pillow. *See United States v. Malone*, 886 F.2d 1162, 1165 (9th Cir.1989) (airport search of suspected drug courier).

▪ Elizalde contends that the extensive length of time that he was detained constituted an arrest without probable cause. The facts do not support Elizalde's claim that he was detained for an unreasonable time. Hoffman arrived at the rest stop at about 1:20 a.m. He radioed for the narcotics canine about 11 minutes after contacting Elizalde. Bennett and Mac arrived at the rest stop at about 2:20, less than one hour after Hoffman radioed. Elizalde testified that it was about 2:00 or 3:00 a.m. when he left the rest stop. Although Elizalde's testimony as to the time is very vague, it appears that the entire encounter took 90 minutes or less, including the time involved in the consent search.

▪ Although the brevity of the stop is an important factor in determining whether an investigative stop meets the requirements of the Fourth Amendment, the court must also consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). In *Sharpe*, the Supreme Court held that a 40 minute detention was not excessive where most of the delay was caused by practical considerations involved in securing and moving between two vehicles that had been stopped. *Id.* at 687, 105 S.Ct. at 1576.

In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Court held that a delay of 90 minutes was unjustified because the police knew of the defendant's arrival time at an airport for several hours beforehand, and thus could have arranged for a narcotics canine in advance. *Id.* at 709, 103 S.Ct. at 2645. In this case, there is no suggestion that Hoffman could have done anything to prepare in advance for the investigation, or to shorten the investigation. In the recent case of *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Court approved a delay longer than 90 minutes. Sokolow was stopped in an airport at 6:30 p.m. and his luggage was held for a sniff test by a trained dog and while awaiting the issuance of a search warrant. The Court held that it was not unreasonable to keep Sokolow's luggage overnight, because by the time the sniff test was performed at 9:30 p.m., it was impossible to get a search warrant before morning. *Id.* at 3, 109 S.Ct. at 1583.

In this case, the entire encounter took about 90 minutes, a portion of which was by consent. In light of the practical difficulties in bringing the narcotics canine to the scene, this investigative detention was not unreasonable, and did not turn the detention into an arrest. Elizalde's motion to suppress is denied.

## II. MOTIONS FOR SUMMARY JUDGMENT

▪ Elizalde and the government make cross-motions for summary judgment. In

light of the denial of Elizalde's motion to suppress, his motion for summary judgment must also be denied. The government has presented evidence which could satisfy its burden to show probable cause for the forfeiture of the currency. This evidence includes the possession of such a large amount of currency, the inconsistencies in Elizalde's statements regarding his knowledge of the currency, the alert by the narcotics canine, Elizalde's statement that the money belonged to a Roberto Lopez, and the factors consistent with the modus operandi employed by drug/money couriers. Therefore, Elizalde's motion for summary judgment is denied.

In its motion for summary judgment the government argues first that Elizalde lacks standing because he has stated that the currency belongs to Roberto Lopez. However, Elizalde has asserted a possessory interest in the currency, which is adequate to establish his standing as a claimant. It is not necessary that a claimant prove outright ownership of the defendant property. A lesser property interest, such as possession, creates standing in a forfeiture action. *United States v. 1982 Sanger 24' Spectra Boat*, 738 F.2d 1043, 1046 (9th Cir.1984).

The more substantial contention of the government concerns Elizalde's ability to show either that the currency is not forfeitable or that he has a defense to forfeiture. In civil forfeiture actions there is a shifting burden of proof at trial and on a motion for summary judgment. 19 U.S.C. § 1615; *United States v. Padilla*, 888 F.2d 642, 643 (9th Cir.1989). The government must make an initial showing that there is evidence which could support a finding of probable cause to forfeit the defendant. If the government submits such evidence, the burden shifts to the claimant to submit evidence that the defendant is not subject to forfeiture. *United States v. $5,644,540 in United States Currency*, 799 F.2d 1357, 1362 (9th Cir.1986).

In this case, the government has met its burden to produce evidence which could establish probable cause for forfeiture. The claimant must then produce evidence which could meet his burden of showing that the currency is not forfeitable or that there is a defense to forfeiture. Elizalde has submitted no evidence that could meet this burden, other than the bald statement that he has a right to the currency. Elizalde asserted his Fifth Amendment privilege and refused to answer all discovery requests regarding the source of the currency; his purpose for traveling on I–5; the amount and sources of his income and assets; his employment status and history; the names and addresses of all witnesses that would support his claim; and the nature of Roberto Lopez' interest in the currency.

A claimant may not avoid his burden on a motion for summary judgment simply by asserting the Fifth Amendment. *United States v. Rylander*, 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983). The Fifth Amendment does not prevent a court from drawing a negative inference against a party to a civil action who refuses to testify in response to probative evidence offered against him. *Baxter v. Palmigiano*, 425 U.S. 308, 318–19, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976). Although this court could not draw a negative inference from Elizalde's refusal to testify in a criminal case, and could not force Elizalde to waive his Fifth Amendment privilege in this case, this court cannot excuse Elizalde from his obligation to submit probative evidence in support of his civil forfeiture claim. *Baker v. United States*, 722 F.2d 517, 518 (9th Cir.1983).

Thus, Elizalde has failed to submit evidence which could meet his burden to show that the currency is not forfeitable or that there is a defense to forfeiture. The government's motion for summary judgment is granted.

CONCLUSION

Elizalde's motion to suppress is denied. Elizalde's motion for summary judgment is denied. The United States' motion for summary judgment is granted. Judgment

will be entered in favor of the United States.