**UNITED STATES of America,
Plaintiff,**

v.

**Jesus Martin URREA–
LEAL, Defendant.**

**No. 04–40037–02–JAR.**

United States District Court,
D. Kansas.

June 24, 2004.

---

**23.** *See Metz,* 39 F.3d at 1493.

Thomas G. Luedke, Office of United States Attorney—Topeka, Topeka, KS, for Plaintiff.

Marilyn M. Trubey, Office of Federal Public Defender—Topeka, Topeka, KS, for Defendant.

## MEMORANDUM ORDER DENYING MOTION TO SUPPRESS

ROBINSON, District Judge.

On June 14, 2004, the Court held a hearing on defendant's motion to suppress (Doc. 25) all evidence seized from the search of a Dodge van rented by the defendant and driven by his mother. Having reviewed the evidence and arguments presented by the parties, the Court concludes that there was reasonable suspicion justifying the short detention of the defendant and his mother, and that the defendant and his mother voluntarily consented to the trooper's search of the vehicle. Thus, the motion to suppress is denied.

### Facts

At approximately 6:40 a.m. on March 30, 2004, Kansas Highway Patrol Trooper Scott B. Morris observed a Dodge van make a sudden and dangerous lane change as it traveled east bound on Interstate 70 in Shawnee County, Kansas. After the lane change, the van was a mere 12 to 15 feet behind another vehicle, too close for the "highway" speed it was traveling. Trooper Morris followed the van for approximately a mile, long enough to check the license tag and determine that the license tag was registered to a jeep, not a Dodge van. With this reasonable suspicion of a traffic violation, improper display of a license tag, Trooper Morris effected a traffic stop.

Trooper Morris parked behind the van, approached the vehicle from the driver's side, and encountered Griselna Lugo–Leal and her adult son, Jesus Martin Urrea–Leal. Griselna Lugo was driving the van; Jesus Urrea, the sole passenger, was in the right front passenger's seat. Trooper Morris spoke to Griselna Lugo and Jesus Urrea through the driver's side window, advising them that he had stopped them because the license tag was not registered to that vehicle. At the trooper's request, Jesus Urrea handed the rental agreement to his mother, who in turn handed it to the trooper. The van had been rented by Jesus Urrea. At the trooper's request, Griselna Lugo handed him her driver's license.

Trooper Morris obtained these documents and spoke with Jesus Urrea and Griselna Lugo for approximately two minutes, asking them about their travel plans. Both Jesus Urrea and Griselna Lugo appeared to understand Trooper Morris as he spoke to them in English; they responded appropriately to his statements and requests. They both spoke English to him. He asked them where they were going. Lugo responded, in English, that they were traveling to St. Louis to visit her sister; Urrea responded, in English, that they were traveling to St. Louis to visit his aunt.

Trooper Morris took the rental agreement and driver's license back to his vehicle. He ran checks on the information and issued a warning citation for improper display of license tag. Back at his vehicle, Trooper Morris ran Lugo's driver's license and did criminal history checks on she and Urrea. The records checks revealed nothing of concern to Trooper Morris. As he sat in his vehicle, another trooper arrived, parking his patrol vehicle behind Trooper Morris's vehicle. This other trooper, and a deputy who arrived later, did not get out of their vehicles at this point. Trooper Morris testified that he doubted that Lugo and Urrea could see the other trooper's vehicle behind his, based on the positioning of their vehicles.

By the time Trooper Morris had taken the documents back to his vehicle, he suspected that Lugo and Urrea were engaged in criminal activity, based on a number of things he observed. First, during his two minute encounter with them, both Lugo and Urrea exhibited "excessive nervousness." Trooper Morris's considerable training in criminal interdiction had taught him certain universal indicators of excessive nervousness, including what he observed in Lugo and Urrea. Both were breathing rapidly, avoiding eye contact with him, and their hands were shaking as

they passed or handed papers to him. This nervousness did not subside during his two minute encounter with them. Trooper Morris's training and ten years of interdiction experience have taught him, that while people may initially be nervous during a traffic stop, their nervousness subsides during the traffic stop. When the nervousness does not subside, that is an indicator of suspicious conduct.

But there were other indicators in addition to the behavior exhibited by Lugo and Urrea. Trooper Morris has been involved in more than 50 interdiction stops in which drugs were seized; 30 to 35 of these were marijuana seizures. Training and experience has taught him that transporters of drugs often attempt to mask or cover up the odor of drugs with other odors. As Trooper Morris spoke with Lugo and Urrea, he detected the odor of fabric softener or laundry detergent. Trooper Morris knew that detergent and fabric softener sheets are commonly used to mask the odor of marijuana.

In addition to observing their behavior and detecting the odor of something commonly used to mask the odor of controlled substances, Trooper Morris knew that this vehicle had been rented in Phoenix, Arizona, and that Lugo and Urrea resided in Tucson, source areas of controlled substances. Trooper Morris's training and experience had taught him that drug couriers often use rental vehicles, to avoid risking the seizure of their personally owned vehicles. His training and experience had also taught him that drug couriers often rent vehicles for relatively short periods of time, because they deliver drugs and quickly return to their original destination. Urrea rented this van on March 28; two days later the van was in Topeka, supposedly en route to St. Louis; the van was due back at the rental agency in Phoenix in four days, on June 4.

As he sat in his patrol car running records checks, Trooper Morris realized that he had not activated the video camera installed in the vehicle. Although he had been on duty since 6:00 a.m., at the time he stopped the Dodge van, he was en route to a canine training session commencing at 7:00 a.m. that morning. In fact, Trooper Morris, who is a canine handler, had his drug dog in the patrol car with him at the time he made this stop.

After a mere 5 to 6 minutes in his patrol car running records checks, and with the camera now activated, Trooper Morris returned to the van. Through the driver's side window, Trooper Morris handed the driver's license and rental agreement back to Lugo and Urrea. He again told them in English that the license tag did not match the vehicle and that they needed to let the rental company know. He wished them a safe trip. The videotape depicts the van's tail lights coming on, indicating that Lugo had put the van into drive gear and had her foot on the brake. At this point, Trooper Morris took one step away, then turned back towards the van and asked if he could ask them a couple of questions. The responses of Lugo and Urrea are not audible, but in short succession, Trooper Morris is heard: asking them if they have drugs or money in the car; to explain several times that law enforcement has experienced drugs being transported from Tucson; and he is heard asking them if he can search the vehicle. Trooper Morris testified that he asked Jesus for consent to search, since Jesus had rented the vehicle.

Trooper Morris further testified that at this point, Lugo and Urrea started conversing in Spanish; Trooper Morris did not understand what they said to each other. Trooper Morris's testimony that Lugo and Urrea both seemed to understand his statements and questions in English, is corroborated by the testimony of Lt. Ray Bailiff. Lt. Bailiff testified that a DEA agent had advised him that in March 2001, Lugo and Urrea were stopped in Arizona, consented to a search of the vehicle they were in, and found to be in possession of 170 pounds of marijuana. The DEA agent conversed with Lugo and Urrea extensively, as they cooperated in a controlled delivery of the marijuana. The DEA agent advised Lt. Bailiff that Urrea was fluent in Spanish and English, and that Lugo was able to converse in English to a "certain point" beyond which she conversed by using Lugo as her interpreter.

Although Lugo and Urrea's responses are not audible, the videotape indicates that they both got out of the vehicle only seconds after Trooper Morris asked them for consent to search. There is no audible or visual indication that Lugo and/or Urrea denied consent, revoked consent, or communicated reluctance to allow the search, or a desire for the search to stop. Trooper Morris testified that after they exited the van, they probably noticed the other trooper's vehicle, but at this point neither the other trooper nor the other deputy had exited their patrol cars.

Within one minute after Lugo and Urrea exited the van, and within two minutes after they verbally granted consent to search, the videotape depicts Trooper Morris opening the rear hatch and immediately stating "its back here." Trooper Morris testified that as soon as he opened the hatch, he detected the odor of marijuana, and he observed large canvas bags laying in the cargo area in plain view. The videotape depicts Trooper Morris immediately placing Lugo and Urrea under arrest. Trooper Morris testified that given their consent to search, he did not remove his drug dog from the patrol vehicle to sniff the van; but had he not obtained consent to search, he would have had his drug dog do a sniff. Based on the dog's experience in working with him since October 2000, Trooper Morris is certain that the drug

dog would have alerted to the van. Notably, after the drugs were seized, Trooper Morris had the drug dog run around the van and the drug dog alerted at that time, indicating that it detected the odor of drugs in the van.

### Discussion

■ The Fourth Amendment protects individuals from unreasonable searches and seizures.[1] An unconstitutional seizure may render an otherwise constitutional search invalid under the Fourth Amendment if the search resulted from the illegal seizure or detention.[2]

As established by Supreme Court precedent, there are three general types of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, [which are] the most intrusive ... and [are] reasonable only if supported by probable cause."[3]

Defendant Urrea does not challenge the traffic stop; such a challenge would be without merit. There was reasonable suspicion to stop this vehicle for displaying an improper tag, as well as reasonable suspicion of other traffic violations concerning lane changes and following too closely.[4]

■ Rather, Urrea challenges the detention of he and Lugo, contending that Trooper Morris had no reasonable suspicion supporting his detaining them to run records checks. Even if the initial stop of the van vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[5] "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.' "[6] It must be temporary, and its scope must be carefully tailored to its underlying justification.[7]

■ Here Trooper Morris had reasonable suspicion to stop the vehicle. And, based on his observations and experience, he had sufficient reasonable suspicion of criminal activity, to justify his investigative detention of Urrea and Lugo.[8] During his brief investigative detention of them, he checked the validity of Lugo's

1. U.S. Const. amend IV.

2. *United States v. Miller*, 84 F.3d at 1250 (10th Cir.).

3. *United States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir.1996) (citations omitted).

4. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (*citing Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))[A stop can be supported as an investigative stop on the basis of the trooper's reasonable suspicion that the occupants were involved in criminal activity.]; *Terry*, 392 U.S. at 22, 88 S.Ct. 1868 (1968) *quoting Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)[Reasonable suspicion is one that would "warrant a man of reasonable caution in the belief' that [a stop] was appropriate."]

5. 392 U.S. at 20, 88 S.Ct. 1868.

6. *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

7. *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997), *cert. denied*, 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998); *United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997).

8. Trooper Morris had reasonable suspicion of criminal activity based on: the excessive nervousness of Jesus and Griselna; the odor of detergent or fabric softener; the fact that the van was rented; that Jesus and Griselna were traveling from a source area; and the relatively short term of the rental agreement given their stated travel plans.

driver's license, ran records checks and issued a citation or warning. Having accomplished all of that within 10 minutes [9] of the initial stop, Trooper Morris returned the documents to Urrea and Lugo, and wished them a safe trip, ending the investigative detention.[10] At this point, an officer usually must allow the driver to proceed without further delay.[11] However, a longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[12]

■ Once Trooper Morris's records checks revealed that the driver's license and rental agreement were valid, and that neither Lugo nor Urrea had any criminal history of concern, Trooper Morris returned to the vehicle, returned the documents and ended the investigative detention. This took less than one minute; and the investigative detention became a consensual encounter.

"In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if any, bright-line rules." [13] Rather, the court must consider "the totality of the circumstances in a particular case." [14] While the return of documents, such as a driver's license or other personal papers, is a prerequisite to an encounter becoming consensual, the Tenth Circuit has acknowledged that those circumstances are "not always sufficient to demonstrate that an encounter becomes consensual." [15]

Accordingly, even after the officer returns a driver's papers, the encounter may

9. Significantly longer waiting periods have withstood challenge. *See United States v. Villa–Chaparro*, 115 F.3d 797, 802–03 (10th Cir.), *cert. denied*, 522 U.S. 926, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997) (extended detention of almost forty minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment); *United States v. Garcia*, 52 F.Supp.2d 1239 (D.Kan.1999) (finding a delay of 40 minutes not unreasonable where supported by reasonable suspicion, even where the driver was being detained against his will.); *United States v. Alpert*, 816 F.2d 958 (4th Cir.1987) (upholding 50 minute detention); *United States v. Hardy*, 855 F.2d 753, 760 (11th Cir.1988) *cert. denied* 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989); *United States v. $64,765.00*, 786 F.Supp. 906, 912 (D.Or.1991); *Cf. United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (declining to adopt "outside time limitation" for permissible *Terry* stop, but admonishing prior to *Sharpe* that 90 minutes is probably too long for a *Terry* stop); *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (holding that in distinguishing a true investigative stop from a de facto arrest, the court must not adhere to "rigid time limitations" or "bright line rules."); *United States v. Borys*, 766 F.2d 304, 313 (7th Cir.1985) (75–

minute detention was "at the outer bounds of the Constitution").

10. The Tenth Circuit has consistently held "that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him." *See United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.), *cert. denied*, 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484(1994); *accord United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir.1995).

11. *Patten*, 183 F.3d at 1193; *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997).

12. *United States v. Hunnicutt*, 135 F.3d at 1349.

13. *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir.1997)

14. *Id.* at 814 (citing *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)).

15. *Elliott*, 107 F.3d at 814; *see also United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996).

not be consensual where "there was evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.' "[16] The Tenth Circuit has observed in dicta that an officer leaning on a car may support a finding of a coercive show of authority.[17] However, the ultimate test is whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." [18]

Urrea's argument notwithstanding, the initial detention ended when Trooper Morris returned the documents to them, wished them well, and stepped away from the car. At that point, the encounter became consensual, best demonstrated by Lugo's putting the car into drive gear and preparing to pull out. Thus, in the context of a consensual encounter, Trooper Morris asked for permission to ask them a couple of questions. Even though he quickly began asking questions including asking for consent to search, there is no evidence that Urrea or Lugo hesitated or refused to answer his questions or allow him to search the vehicle. And because the encounter had become consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play.[19]

Urrea argues that it never became a consensual encounter, because Trooper Morris asked rapid fire questions in English, a language Lugo is not conversant in, and that she had no effective opportunity to leave. But the videotape, Trooper Morris's testimony and Lt. Bailiff's testimony prove otherwise. Although Lugo was not fluent in English, during the initial encounter with Trooper Morris, she appropriately responded to his questions, signifying that she understood his questions. And, it is clear that Urrea is fluent or significantly conversant in English and Spanish, as Lt. Bailiff testified. When Trooper Morris asked for consent to search, Urrea and Lugo conversed in Spanish, and then exited the vehicle. It appears that Urrea translated or explained Trooper Morris's question to Lugo.

Notably, Urrea and Lugo had been involved in an interdiction traffic stop in 2001 and consented to a search of that vehicle. Both had agreed to participate in a controlled delivery, and to that end had conversed extensively with a DEA agent. Under no stretch of the imagination did Urrea and Lugo not understand what Trooper Morris was asking of them during this 2004 interdiction stop. There is no evidence that they did not consent or did not understand the request for consent. There is no evidence that they were coerced to consent. There is no evidence that they revoked their consent. Moreover, even if there was no valid consent to search, Trooper Morris would have inevitably discovered the marijuana once the drug dog had sniffed the car.[20] Accordingly, the motion to suppress is denied.

16. *Elliott,* 107 F.3d at 814.

17. *Id.*

18. *United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993).

19. *See United States v. Walker,* 933 F.2d 812, 816–17 (10th Cir.1991) *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

20. *See United States v. Haro–Salcedo,* 107 F.3d 769, 773 (10th Cir.1997) (holding that even though an inventory search was for improper motives, and thus suppressible, the evidence would be admitted because police had authority to conduct a lawful inventory search and, thus, the doctrine of inevitable discovery salvaged the evidence).

IT IS THEREFORE ORDERED BY THE COURT that the defendant's Motion to Suppress Doc. 25 is DENIED.

IT IS SO ORDERED.